IN THE UNITED STATES DISTRICT COURT



FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| D. I. CHANCE, ET AL. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. G-97-282 |
| | § | (Consolidated w/G-92-232) |
| PHILLIPS PETROLEUM COMPANY, | § | |
| ET AL. | § | |

## REPORT AND FINDINGS

The Court, acting as Special Master, hereby submits to the District Court its Report and Findings regarding recoverable damages of the non-settling Plaintiffs.

## BACKGROUND FACTS

In 1947, Phillips Petroleum Company purchased, from the United States Government, a refinery located in Sweeny, Texas. The refinery has been in continuous operation by Phillips since that time. Over the years, Phillips has vastly expanded the refinery which now produces numerous consumer and industrial products including gasolines and other fuels. In July 1991, Brown & Root, as contractor, completed construction of a new multi-million dollar ethylene plant, Unit 33, at the Phillips facility. The Unit was brought "on line" in December 1991 and began operations. Included in the ethylene plant was a 60-foot high flare pipe designed to burn away contaminated products. Because of its purpose, the flare operates only sporadically, however, when the flare does "go off" it, apparently, sounds like an explosion at the Plant and generates a continual noise which, according to D.I. Chance, is louder than the noise level on the runways at Bush Intercontinental Airport. When the flare erupts at night, it emits so much light that it seems like daytime in the surrounding area.

It was only about a month after Unit 33 came on line that a group of local residents filed this lawsuit claiming that the Phillips refinery had become an intolerable nuisance which had resulted in damages to them personally and to their properties. In 1995, most of the Plaintiffs settled their claims with Phillips; however, a handful of Plaintiffs, including those made the basis of this Report, refused the global settlement terms negotiated between their lawyers and Phillips. The District Court, in its Order approving the settlement, dated October 17, 1995, appointed this Court as Special Master to address the issue of the damages, if any, recoverable by the non-settling Plaintiffs.

On January 18, 1993, a second lawsuit was filed in Matagorda County against, *inter alios*, Brown & Root for its role in the construction of the ethylene plant. This lawsuit, like the first, sought damages for injuries caused by Unit 33. In an Amended Complaint, Phillips was named as a Defendant. After the state court dismissed the Plaintiffs' claims against all Defendants except Phillips, Phillips, on May 14, 1997, removed that lawsuit to this District Court. On September 18, 1997, the suit was consolidated with the 1992 lawsuit, and proceeded under the 1997 case number: G-97-cv-282.

On June 16, 1999, counsel for Plaintiffs filed a motion to withdraw. The motion was prompted by a lawsuit filed against counsel by some of the settling Plaintiffs who were unhappy with their settlement results. At a Hearing on June 23, 1999, this Court determined that the motion had to be granted under controlling Professional Conduct Rules, and counsel were permitted to withdraw. Contemporaneously, an Evidentiary Hearing on damages set for July 14, 1999, was cancelled and the remaining Plaintiffs were given time to find new counsel. The Plaintiffs' efforts to employ new counsel were unsuccessful and they were forced to proceed *pro*

2

*se*. Ultimately, this Court, over a period of several months, conducted Evidentiary Hearings with those Plaintiffs who could be located.  Obviously, those *pro se* Plaintiffs were at an incredible disadvantage at the Hearings.  Consequently, this Court virtually suspended the formal Rules of Evidence in an effort to give them a full, and as fair as possible, opportunity to present their claims; the Court, however, will not and cannot relax or suspend the operation of the applicable law.  The Court also accepted post-hearing submissions from the parties.

Having now considered the Parties' evidence and submissions and having reviewed the evidence and information contained in the case files, this Court issues its Report to the District Court together with its apology for any delay.

## THE TEXAS LAW OF NUISANCE

As indicated above, most of the Plaintiffs claims are grounded on the tort theory of nuisance.  Since the Texas Supreme Court decision in Burditt v. Swenson, 17 Tex. 489 (1856), Texas Courts have defined a nuisance as a condition that substantially interferes with the use and enjoyment of  land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it.  See e.g. Bible Baptist Church v. City of Cleburne, 848 S.W.2d 826, 829 (Tex. App. -- Waco, 1993, writ denied)   An actionable nuisance can occur in one of three ways:  (1) by physical harm to a persons's property, such as by an encroachment of a damaging substance or by the property's destruction; (2) by physical harm to a person on his property, such as by an assault on his senses of sight or smell or by some other personal injury as a result of exposure to the nuisance; or (3) by emotional harm to a person from the deprivation of the enjoyment of his property, such as by fear, apprehension, offense, or loss of peace of mind.  See William L. Prosser, Nuisance Without Fault, 20 Tex.L.Rev. 339, 414-15 (1942)   Hence,

3

the Plaintiffs, to justify an award of damages must present sufficient facts to establish one or more of these theories of recovery.

Texas law recognizes two species of nuisance.  One is a "nuisance per se" which is an act, occupation or structure that is a nuisance at all times, under any circumstances, and in any location.  The other is a "nuisance in fact" which is an act, occupation or structure that becomes a nuisance only by reason of its particular circumstances or surroundings.  See Freedman v. Briarcroft Property Owners, Inc., 776 S.W.2d 212, 216 (Tex. App -- Houston [14th Dist.] 1989, writ denied)    Although the definitions seem extremely broad, Texas law restricts their applications in ways which are significant to this lawsuit.  Because Texas has an abundance of energy-related industry, Texas Courts have disallowed nuisance per se claims against lawfully run industries, like oil refineries.  See Hall v. Amoco Oil Company, 617 F.Supp. 111 (S.D. Tex. 1984)  Therefore, the Plaintiffs in this case are precluded from resting their claims on the mere existence, expansion, and/or operation of the Phillips Plant.  Texas Courts have also refused to recognize nuisance in fact claims which result only in complaints of fear, apprehension and emotional distress caused by the operation of such industries.  Maranatha Temple v. Enterprise Products, 893 S.W.2d 92, 100 (Tex. App. -- Houston [1st Dist] 1994)   Therefore, the Plaintiffs in this case may not recover damages for mental anguish, including fear of future disease from chemical exposure, unless or until medically reliable physical manifestations of the disease are found.  See Temple-Inland Forest Products v. Carter, 993 S.W.2d 88, 94 (Tex. 1999) (Declaring Fifth Circuit cases reaching a contrary conclusion as misstatements of Texas law)    This is not to say that potential Plaintiffs do not suffer genuine distress, they do, and it is reasonable for them

4

to do so.  It simply means that despite the apparent breach of some legal duty, Texas law affords

no right of recovery when only mental anguish results from exposure to an industrial nuisance.

Having state those basic relevant tenants of the Texas Law of Nuisance, the Court will

address each Plaintiff's claims.

### D.I. CHANCE, III

D.I. Chance, III, (Chance) was born and raised in Old Ocean, Texas, near the Phillips

Plant, on property owned by his parents.  In 1975 he moved to Houston; however, he testified that

he had always hoped to return to Old Ocean after retirement and live on the family property for

free.  In 1995, Chance reached retirement age, but he elected not to return to Old Ocean because

intolerable living conditions caused by the Plant make it impossible for him to retire there.  Due

to his inability to take advantage of the opportunity to live in Old Ocean for free, Chance claims

Phillips should reimburse him for mortgage and rental payments he has been forced to make since

his retirement in 1995.

This claim has no merit under applicable law.  First, it was Chance's own decision, albeit

an understandable one, to forego moving back to Old Ocean.  Second, and most conclusive,

Chance has no ownership interest in the property.  Under Texas law a Defendant like Phillips

owes no legal duty to a person who suffers economic loss as a result of damages the Defendant

caused to the property of a third person.  See Rodriguez v. Carson, 519 S.W.2d 214, 216 (Tex.

Civ. App. -- Amarillo, 1975)   Any obligation that might arise under these facts would arise by

reason of some "contractual" relationship between Chance and the property owners, his parents.

In the absence of a vested ownership interest in the property, Chance has no cause of action

against Phillips for the loss of the expected economic benefits of free rent.  Cf. Robins Drydock

5

v. Flint, 275 U.S. 303 (1927); see also State of Louisiana ex rel. Guste v. M/V Westbank, 752 F.2d 1019 (5th Cir. 1985) (Absent physical injury to a proprietary interest, Plaintiffs may not recover for pure economic losses under nuisance theory)

In 1990, Chance was diagnosed with a heart disease.  He has also suffered from other physical problems including respiratory problems, high blood pressure, stress, a left-hand tremor, periodic rashes, and some memory loss.  One of his treating physicians, Dr. Richard Harper, a neurosurgeon, has told him that exposure to chemicals could possibly be a cause of some of these problems.  Of course, some or all of Chance's medical problems may have been caused by Phillips, but Chance concedes that he has no evidence that will establish a causal connection to a reasonable degree of medical probability.  Without such proof, his claim is, at best, speculative and, therefore, insufficient to merit a recovery of damages.  Viterbo v. Dow Chemical Company, 646 F.Supp. 1420 (E.D. Tex. 1986) aff'd 826 F.2d 420, 423-24 (5th Cir. 1987)

Finally, as noted above, any claim Chance may assert for fear of contracting a future disease attributable to Phillips is not cognizable in Texas.  Of course, if such a disease does manifest itself, Chance may then file suit; the statute of limitations in such a situation does not commence until the manifestation makes the disease diagnosable.  See Pustejovsky v. Rapid-American Corp., 35 S.W.3d 643, 653 (Tex. 2000)

For the foregoing reasons, it is the **FINDING** of this Court that D.I. Chance, III, is not entitled to recover any damages for his claims asserted against Phillips.

## ARTHUR CHANCE

Arthur Chance (Arthur) was also born and raised in Old Ocean on his family's property.  For 30 years he lived there without paying any rent or mortgage payments.  In 1985, he married

6

Renee who refused to live on the property because of the effects of the Phillips Plant. Consequently, they moved to a neighboring community where they lived until 1988. In 1988, they moved to Humble, Texas.

Arthur claims damages as a result of being personally exposed to the nuisance created by the Phillips Plant, including, but not limited to its noise, its flares, its periodic chemical releases and its numerous explosions. As a person rightfully occupying the land where he grew up, Arthur had a potential claim for such damages. See Hanes v. Continental Grain Co., 58 S.W.3d 1, 5 (Mo. App. E.D. 2001) (Plaintiff living in his father's house on his father's land with his father's consent may recover damages for personal injuries caused by Defendant's nuisance) Unfortunately, for Arthur, any such claim was required, by Texas law, to be asserted within two years of any injuries he suffered. Tex.Civ.Prac.&Rem.Code § 16.003 (Vernon Supp. 2000), see also Mitchell Energy Corp. v. Bartlett, 958 S.W.2d 430, 436 (Tex. App. -- Ft. Worth, 1997 writ denied)(Personal injury claims for nuisance are governed by § 16.003)  Obviously, Arthur was aware of the nuisance he endured during the years of his exposure to it; however, that exposure ended when he left Old Ocean in 1985. The statute of limitations begins to run when a Plaintiff first becomes aware of any actionable injury. Childs v. Haussecker, 974 S.W.2d 31, 37 (Tex. 1988)  But even if Arthur's move from Old Ocean started the running of the limitations period, two years later, in 1987, it elapsed. Consequently, this claim of Arthur's, first asserted in 1997,[1] for damages for any known past personal injuries caused by the nuisance created by Phillips is barred.

---

[1]  Arthur and his brother became Plaintiffs to this suit on November 17, 1997, however, even if they had been original Plaintiffs, the limitations period would have already expired by the time suit was filed in January of 1992.

7

Arthur also seeks recovery of the amounts he paid in rent from 1985 to 1988. This claim would also be time-barred. Regardless, since Arthur had no ownership interest in the Old Ocean land this claim for economic loss, like that of is brother D.I. Chance, III, discussed above, is not even cognizable under Texas law.

Arthur also seeks damages for his laundry expenses in the amount of $1,872.00. This is the amount he paid from 1979 through 1985 to have his clothing dried at a local laundry after the air pollution caused by Phillips to the property in Old Ocean made it impossible to continue drying his clothes on a clothes line. Notwithstanding the limitations problem, this claim, like his claim for rent reimbursement, fails because Arthur had no ownership interest in the Old Ocean property. At first blush, this may not seem fair given Arthur's presence on the property as that of, in essence, a full time tenant. Unfortunately, as stated above, Texas law does not recognize a legal duty of a Defendant to a Plaintiff who suffers a purely economic loss as a result of property damage caused by that Defendant to the property of a third party. The Court does not question Arthur's economic loss, it is simply without legal authority to remedy it.

Finally, Arthur seeks to recover funds for future medical surveillance based upon his sincere fear that he may develop some future disease as a result of his exposure to the activities at the Phillips Plant. For reasons similar to those which cause Texas to refuse to recognize a cause of action for only emotional distress caused by a nuisance, this claims also fails. "The difficulty in predicting whether exposure will cause any disease and if so, what disease, and the long latency period characteristic of (such) diseases, make it very difficult for Judges and Juries to evaluate which exposure claims are serious and which are not." Temple-Land Forest Products, 993 S.W.2d at 93     Liability is, therefore, unpredictable. This is consistent with the general

8

requirement in Texas that claims seeking damages for future medical care require a showing of a present injury.  K-Mart Corp. v. Pearson, 818 S.W.2d 440, 415 (Tex. App. -- Houston [1st Dist] 1991)   If a claimant were permitted to recover damages for medical monitoring over a substantial period of time, but never developed any disease that he feared, he would receive a windfall.  The recognition of such a cause of action would also result in a tremendous proliferation of such claims because most Americans are subjected to toxic substances, even in the air they breathe and the food they eat, on a daily basis.  Without doubt, Arthur lives with the consistent fear that he may develop some disease as a result of exposure to the Phillips Plant, however, Texas has decided that this type of claim is not available due to the difficulties in determining the genuineness of each such claim and the appropriate recovery.  Any bodily injury Arthur may have suffered that his attributable to Phillips is, at present, latent; any eventual consequences are completely uncertain.  Even in jurisdictions that allow claims for medical monitoring, a Plaintiff must demonstrate that he has an actual physical injury that requires future monitoring.  See, e.g., In re: Paoli RR Yard PCB Litigation, 916, F.2d 829, 852 (3d Cir. 1990) (Construing Pennsylvania law)   The Court certainly hopes Arthur will never develop any disease, but if he does manifest symptoms he will be able, at that time, to pursue a claim against Phillips.  Pustejovsky, 34 S.W.3d at 653 (Statute of limitations begins to run from the time a disease may be diagnosed)  At the present time, however, it would not be appropriate to compel Phillips to pay damages for merely speculative injuries.  The Court, therefore, finds that this claim has no merit and should be denied.

For all of the foregoing reasons, it is the **FINDING** of this Court that Arthur Chance is not entitled to recover any damages for his claims asserted against Phillips.

9

## JOHN DAMON, III

In 1989, John Damon received title and moved to a 10 acre plot of land directly adjacent to that part of the Phillips Plant where Unit 33 was ultimately built. Before the ethylene plant became operational, Damon claims that he had no problems with the Phillips Plant. That all changed when Unit 33 went "on line" and the flare began to erupt. The flare, which, Damon says, goes off once or twice or maybe ten times a year has, in his opinion, rendered his property worthless, caused him personal harm and instilled in him the fear of future disease.

The Court agrees that the ethylene plant has diminished the value of Damon's land. Unfortunately, there is no reliable evidence from which the correct measure of damages can be determined. The Phillips Plant, from its inception, had an adverse impact on the surrounding property. Each expansion of the Plant increased that impact. The installation of Unit 33 simply added to that impact. Clearly, the vast majority of the Plant's adverse impact on the property in question occurred long before Damon owned it and that previous diminution would not be recoverable by him. See Bowie Sewerage Co. v. Vann, 59 S.W.2d 180, 182 (Tex. App. -- Ft. Worth, 1932)  Carving out the diminution of value attributable solely to the ethylene plant would be, if possible at all, a substantial task; it is one that cannot be completed with only the evidence before the Court. Damon admits that he has never had his property appraised and that he has never tried to sell it. These admissions undercut his testimony that his only options are to abandoned the property or stay there; in fact, Damon testified he would pay $25,000.00 for the property now as a willing buyer. The records from the Brazoria County Central Appraisal District, although not in evidence for the years of 1989 through 1991 (pre-Unit 33), indicate that the market value of the property has remained constant at $16,600.00 from 1995 through 2001.

10

The Plaintiff's real estate expert relied upon the CAD records in determining Damon's loss at approximately $10,000.00; however, the expert's report is not in evidence or subject to the Court's scrutiny and even Damon says the CAD evaluation is unreliable.  Damon's own estimate that the property has lost $135,000.00 in value since the flare became operational is completely speculative, especially in light of his admission at the Evidentiary Hearing that he "didn't come prepared to answer (the) question" regarding his "proof" that his property value had diminished.  Moreover, his guess that his property would be worth $160,000.00 in the absence of the flare defies belief.  His lay opinion values his property at ten times the CAD's determination and almost 85% higher than that of the Plaintiff's real estate expert.  The Court, therefore, concludes that it has insufficient evidence from which to calculate the diminution of value to Damon's property.  Nevertheless, Damon has shown an invasion of his property rights caused by the flare.  In such a situation, the law infers some damage to his property.  Unfortunately, for Damon, the law only permits a recovery of nominal damages when no reliable evidence is available to quantify the damage caused by the nuisance.  See Hutchinson v. Texas Aluminum Co., 330 S.W.2d 895, 898 (Tex. App. - Dallas, 1959)    The Court, therefore, **FINDS** that Damon should be awarded nominal damages in the sum of **$1.00** for diminution of the value of his property.

Damon's claim for reimbursement of the $50,000.00 worth of improvements he has made to the property is without merit.  Damon argues that because his property is effectively worthless as a result of the operation of Unit 33, all of the improvements he has made to his home, barn and property have been nullified and Phillips should, therefore, make him whole.  Damon did not indicate which improvements he made before and which he made after the unit came on line; nonetheless, this Court has found no legal authority to support this claim.  Common sense would

11

caution against recognizing such a cause of action. Theoretically, if the law were to recognize Damon's cause of action, he could incrementally build a mansion on a worthless piece of property and live out his life of luxury while tolerating the nuisance of the flare, all at Phillips' expense. The law cannot condone such a scheme. Any claim Damon may have for recoupment of the costs of improvements to his property is subsumed by his diminution claim.

Although Damon does not recognize it, he does have a valid claim for personal injury and mental anguish. Things like noise, odors and emission releases are assaults on the senses and, in Texas, assaults on the senses under the tort of nuisance qualify as physical harm to the person, not merely emotional harm. See Holland v. United States, 94 F.Supp. 2d 787, 791 (S.D. Tx. 2000) (Texas citations omitted)  Therefore, Damon may recover reasonable damages for the personal discomfort, annoyance and inconvenience a person of ordinary sensibilities, *living in the locality where the nuisance is situated*, would suffer as a result of the flare. See Lacy Feed Co. v. Parrish, 517 S.W.2d 845, 851 (Tex. App. - Waco, 1975)  The quantification of those damages, however, must take into account the 50 year existence of the entire Phillips facility. There is not doubt the Phillips Plant had been causing discomfort, annoyance and inconvenience to those living in its vicinity for many years. Damon's opinion that there were no problems until the ethylene unit began to operate flies in the face of all the other evidence in this case. For years, local residents have witnessed the death of plants and animals; releases of chemical clouds; pollution of ponds and creeks; damage to drying clothes; and incessant noise from the Plant. The activation of Unit 33 simply added a new dimension to the nuisance: 1, 2 or maybe 10 times a year the flare erupts. The flare cannot be viewed in complete isolation. Morever, Damon's damages must be asserted only after taking into consideration the ordinary sensibilities of a

12

reasonable person living in the vicinity of the entire Phillips Plant. Under this test, the sporadic "assaults" of the flare, although actionable, do not merit more than minimal relief.

Mental anguish damages are also available in cases in which a physical injury is suffered. Damon, therefore, would be entitled to recovery for any mental anguish he can prove he suffered as a result of the "assaults" by the flare. However, it is important to note that mental anguish is not available for mere worry, anxiety or anger. To recover for mental anguish the record must reveal a high degree of mental pain and distress or the claimant must offer direct evidence of the nature, duration and severity of his mental anguish, thus establishing a substantial disruption of his daily routine. Parkway Company v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995)   Damon is certainly, and perhaps justifiably, upset and angry with Phillips. And anyone who had to live next to an unpredictable flare like that at Unit 33 would probably suffer some anxiety. But there is no evidence in this record of the type of severe mental pain and anguish Texas law requires to support an award for damages. Damon's evidence shows that the nature of his mental anguish attributable to the flare is, for the most part, its nuisance; its duration is short and sporadic; its severity is both brief and, at best, minimal; and it does not substantially disrupt his daily routine.

This Court, therefore, **FINDS** that Damon should be awarded **$2,500.00** in compensatory damages for the personal injuries he has suffered as a result of the assaults on his senses caused by the operation of the ethylene unit at the Phillips Plant.

Finally, Damon seeks damages for the emotional distress attributable to his fear of possible future diseases from chemical exposure. As noted above, Texas does not recognize such a cause of action in the absence of some diagnosable manifestation of a disease. Maranath Temple, 893 S.W.2d at 100   Damon has no evidence that he suffers symptoms which could be linked to

13

exposure to chemicals from the Phillips Plant to a reasonable degree of medical probability; accordingly, the claim has no legal merit. The Court sincerely hopes that Damon never contracts a disease attributable to the Phillips Plant, however, if he does, he may pursue a claim against Phillips at that time, Pustejovsky, 34 S.W.3d at 653.

## LUDWELL S. TAYLOR

In 1974, Ludwell S. Taylor (Taylor) purchased, for $2,000.00, a one acre plot of land in Old Ocean located on State Highway 35 about 3/4 of a mile from the Phillips Plant and moved onto the property with his four children. He also purchased and raised livestock on the property, primarily cattle and hogs. Around 1988 he began to notice what he suspected to be possible evidence of chemical pollution. He also began to suspect that his water well had been contaminated and he ultimately began to purchase water for personal use and consumption, a practice he continued for approximately 15 years. He was living on the property in December 1991 when the ethylene plant came on line.

In November 2000, state officials decided to widen Highway 35. The plan required the procurement of Taylor's property. Negotiations between Taylor and the State commenced. The State valued his property at $40,000.00 and agreed to relocate Taylor to a piece of property of substantially equal value. Therefore, in return for his property, Taylor received a different piece of property worth approximately $40,000.00.

At some time before his relocation, Taylor's livestock began to have health problems. Taylor attributes these problems to Phillips' contamination of his well water. The problem became so wide spread that Taylor felt forced to sell off his livestock, at, in his opinion, a substantial loss.

14

Taylor now claims the following damages: $5,000.00 for diminution of the value of his land; $2,700.00 for the loss of the use of his water well; $17,000.00 as reimbursement for 15 years of purchasing potable water; and $35,000.00 to $40,000.00 for lost income from his livestock.  Taylor, at the Evidentiary Hearing, asserted no complaint directly concerning the ethylene plant flare, however, a fair reading of the pleadings sets forth such a claim.

Taylor's claim for the diminution of the value of his property, while arguably cognizable, fails because Taylor ultimately suffered no damage.  In 2000, the Brazoria County CAD determined Taylor's property had a fair market value of $3,300.00.  The Plaintiffs' expert witness determined the fair market value of Taylor's property to be approximately $13,400.00. Accordingly, when Taylor received the equivalence of $40,000.00 for his property, he arguably realized a "profit" of $26,600.00 to $36,700.00.  The diminution of his property value attributable to the ethylene plant is, therefore, legally unrecoverable.

The remainder of Taylor's claims all center around his allegations that Phillips polluted his water well.  The contaminated water, he believes, poisoned his animals, forced him to purchase usable water and rendered his $2,700.00 water well useless.  Unfortunately, for Taylor, he has no proof, other than his personal belief, that Phillips destroyed his well water.  Moreover, there is evidence to the contrary.  On September 4, 1991, the Texas Water Commission took grab samples of the water from Taylor's well.  The samples were tested and it was determined that the water from Taylor's well, although malodorous, was consistent with the required ground level quality.  Taylor even admits that he does not know if Phillips caused any problems to his well. To recover for nuisance, a Plaintiff must prove that a Defendant was the legal cause of an invasion of the Plaintiff's proprietary interests.  See Cox v. City of Dallas, 256 F.3d 281, 289-290 (5th Cir.

15

2001) (citing RESTATEMENT OF TORTS 2d § 822.  A complete failure of proof of an essential element of a Plaintiff's case renders all other facts immaterial and the Defendant is entitled to judgment as a matter of law.  Cf. Amoco Canada Petroleum Co. Ltd. v. Wild Well Control, Inc., 889 F.2d 585, 588 (5th Cir. 1989) (Decided in context of summary judgment)   Despite the consequences attendant to Taylor's refusal to use his well water and his understandable suspicions that it caused the health problems experienced by his livestock, Taylor is simply unable to prove Phillips is responsible.

Finally, Taylor does have a valid claim for the "assault on his senses" caused by the ethylene plant flare form its start up until his relocation.  Of course, as discussed above in regard to Damon's similar claim, the amount of damages attributable to the additional discomfort, annoyance and inconvenience caused by the flare, when considered in relation to the previously existing facilities is minimal.  In fact, at the Evidentiary Hearing, Taylor barely mentioned the flare.  It is, therefore, the **FINDING** of this Court that Taylor should be awarded the sum of **$1,000.00** for his nuisance claim.

### FRANKY JOE AND BILLIE WAYNE LeMASTER

In 1979 the LeMasters were married and moved onto the 2.4 acre family plot of land in Old Ocean adjacent to the Phillips property.  Through inheritance, Franky and his brother each owned an undivided one-half interest in the property.  Shortly after the LeMasters moved onto the property, Phillips raised the level of its property along the southern border of the LeMaster's land in preparation for the construction of a Tank Farm.  As a result, the LeMasters began experiencing flooding on the property in the late 1980's.  To combat the flooding the LeMasters built a levy to contain the flood waters.  About that same time, Phillips raised its land located west

16

of the LeMaster's property to build a parking lot.  This ground raising has also resulted in sporadic flooding of the LeMaster's property during heavy rains and has caused water damage to the buildings on the property.

According to deposition testimony of Harry Patel, the project manager, Brown & Root-Braun began construction of the ethylene plant (Unit 33) for Phillips in June of 1988.  The ethylene plant included the installation of a long above-ground pipeline which serviced the unit.  The pipeline extended, in part, directly along the entire southern border of the LeMaster's property.  As a result, Brown & Root crew members and equipment were, for a substantial period of time, in the immediate vicinity of, and often trespassing upon, the LeMaster's property.  The pipeline work went on 24 hours a day; consequently, the noise of the construction continued throughout the night.  In addition, bright worklights were used at night which illuminated the LeMaster's home and, along with the noise, adversely affected their ability to sleep.  The pipeline construction also required the use of a huge noisy crane which was often suspended directly over the LeMaster's property.  The pipeline joints had to be x-rayed to detect potential leaks and the LeMasters were, therefore, exposed on a routine basis to high levels of radiation for several months.  The completed pipeline had a steam valve by the LeMaster property which apparently sounds "like a jet engine" when, approximately once a month, it vents steam from unknown substances into the atmosphere.  The ethylene plant construction was completed in July of 1991, accordingly to Patel.

Unit 33 began operation in December 1991 and the LeMasters began to experience the direct effects of the flare:  the explosive noise, the intense light, and the vibration of their home and property whenever it erupts.  Since the start up of Unit 33, both the LeMasters began to suffer

17

from stress.  In support of this claim they have submitted medical records and prescription labels showing Franky was taking XANAX "for stress" in 1992 and Billie was taking PAXIL, NALEX or ZOLOFT for depression and/or stress at least from November 1998 through August 2001.  The stress began to cause personal problems between Franky and Billy.  Franky alleges that his stress level became so high that it also caused him to become belligerent and argumentative while at work at Amoco.  He began to suffer neck and shoulder problems when alienated co-workers refused to help him.  He ultimately lost 6 months of work due to necessary surgery.  His angered boss thereafter demoted him from his day job to the night shift which resulted in a substantial reduction of salary, bonuses, and other financial benefits.  All of this the LeMasters attribute to Phillips.

Like many of the other Plaintiffs in this litigation, the LeMasters are fearful of developing future diseases caused by exposure to chemicals from the Phillips Plant.  They have seen plants damaged.  They have seen chemical sprays and heard of releases.  They can see the steam blast out of the pipeline valve near their home.  They witnessed the pollution of their water well.  And they have even suffered some physical problems.  All of these things cause them to worry about possible future medical problems.

As stated above (see Background Facts), the Unit 33 flare was apparently the "last straw" for those living in the area and several area residents initiated this litigation in January of 1992.  The LeMasters, however, did not become party-Plaintiffs until the filing of the Plaintiffs Second Amended Complaint on January 20, 1993.  This fact has an adverse impact on some of their claims.

18

The Court assumes that the LeMasters continue to assert a claim for the diminution of their property value, separate and apart from their claim for damages to raise its grade. This claim, however, suffers from the same infirmities as that of Damon's: a lack of sufficient evidence from which to determine the correct measure of damages. Surely, the ethylene plant adversely effected the value of their property, but it is virtually impossible to calculate their loss. By the time Unit 33 came on line in December of 1991, the LeMaster's property was bordered by a Tank Farm and a parking lot, it was prone to flooding, and the buildings had been damaged to the point that their last tenant had moved away in 1989. Given the condition of the property by December 1991, the adverse impact of the flare and the steam valve on the property's value is *de minimus*. The Court is aware that the Plaintiff's expert determined the LeMaster's loss to be approximately $88,000.00, but the expert's analysis and report is not available. Moreover, the Brazoria CAD has consistently valued their property at worth $6,920.00, less than 8% of the expert's *loss* determination. The expert's determination is, therefore, inherently trustworthy. The LeMasters themselves have offered no opinion as to the fair market value of their property, except to point out that their neighbor, Mr. Yancey, purportedly sold his 1.5 to 1.7 acres of land for $550,000.00. They have not had it appraised or tried to sell it. There is simply no reliable evidence of the fair market value of the LeMaster property. While the Court can legally infer the occurrence of injury, without the ability to calculate the diminution of value to the property, the law permits only an award of nominal damages in the amount of $1.00. Hutchinson v. Texas Aluminum Co., 330 F.W.2d 895, 898 (Tex. App. -- Dallas, 1959)  The Court, therefore, **FINDS** that the LeMasters should be awarded nominal damages in the sum of **$1.00** for the diminution of the value of their property.

19

Frankie Joe LeMaster's claim for lost wages and benefits is without legal merit. This Court has no doubt that the construction and ultimate operation of the ethylene plant caused him and his wife a great deal of stress. The Court has no doubt that Franky truly believes the stress caused by Phillips' ethylene plant was the proximate cause of his employment problems. This claim, however, presents a classic *post hoc, ergo propter hoc* argument: because the job problems occurred after the stress, they occurred because of the stress. The law requires more. Stress and its effects are topics requiring expert analysis. Cf. <u>Randolph v. Collectramatic, Inc.</u>, 590 F.2d 844, 848 (10th Cir. 1979) (Where the topic of the testimony requires special experience only the testimony of a person with that special experience will be received) Franky LeMaster must establish, to a reasonable degree of medical or psychological certainty, that the stress attributable to Phillips' actions was a producing cause of his job related problems. Cf. <u>Haynes & Boone v.</u> <u>Bowser Bouldin Co.</u>, 896 S.W.2d 179, 182 (Tex. 1995) He has offered no such evidence; he has offered only his unqualified, lay opinion. While his predicate opinion testimony regarding the existence of his stress, buttressed by his evidence of prescriptions and medical records, may be admissible, that opinion, alone, is not sufficient to establish the necessary causal connection. His ultimate opinion regarding causation is merely speculative; it would not be admissible and is, therefore, legally insufficient. <u>See</u> <u>Walton v. Jennings Community Hospital</u>, 999 F.2d 277, 283 (7th Cir. 1993) (Lay opinion that certain information about Plaintiff influenced employers decision to terminate Plaintiff held inadmissible as speculative) Franky LeMaster cannot establish, to the degree required by law, that Philips is responsible for his employment predicament and this claim should be dismissed.

One of the LeMaster's major complaints is of the flooding to their property caused by the ground raising by Phillips for the construction of the Tank Farm and parking lot. Unfortunately, their flood complaint is no longer viable, it is barred by the two-year statute of limitations applicable to nuisance claims in Texas. Mitchell Energy, 958 S.W.2d at 436 (Personal injury claims for nuisance governed by two year statute of limitations)   According to the LeMasters, the flooding started in the "late 1980's." By 1989, the floods had damaged their buildings to the point that the last tenant vacated the property. Any cause of action for property damage caused by a nuisance accrues when a wrongful act effects an injury, Childs v. Haussecker, 974 S.W.2d at 37, therefore, the limitation period begins to run from the time of the initial injury. It is not clear when the LeMasters first witnessed the flooding or the building damage, but it is without question that they knew of these injuries to their property before January 1990. Because the LeMasters did not join this lawsuit until January 20, 1993, the statute of limitations bars these claims even though damages may continue into the future. Trinity River Authority v. URS Consultants, Inc., 889 S.W.2d 259, 262 (Tex. 1994)   Texas law gave the LeMasters two years from the discovery of the flooding problems to file suit against Phillips. They simply waited too long to do so and any damages they have suffered from the flooding are no longer recoverable.

The LeMasters do have a valid nuisance claim for the "assaults on their senses" attributable to the ethylene plant. Their claims, however, are subject to the same limitations mentioned by the Court in discussing Damon's nuisance claims. Unfortunately, for the LeMasters, their delay in joining this litigation has now barred them from recovering damages for many of the problems they endured during the construction of the ethylene plant. As noted above, the LeMasters became Plaintiffs with the filing of the Plaintiff's Second Amended Complaint on January 20,

21

1993. The "relation back" principle of Rule 15 of the Federal Rules of Civil Procedure, does not

apply to the case of a new, additional Plaintiff, <u>Anderson v. Phoenix of Hartford Ins. Co.</u>, 320

F.Supp. 397, 404-405 (W.D. La. 1970) (<u>citing</u> <u>Williams v. United States</u>, 405 F.2d 234 (5th Cir.

1968). Hence, Rule 15 will not resurrect claims of Plaintiffs that are time-barred when they join

existing litigation. As a result, any nuisance claims the LeMasters may successfully assert must

have occurred after January 20, 1991: two years before they became Plaintiffs. Their potential

claims for fear caused by the presence of the crane, annoyance by the worklights, and discomfort

and apprehension from the x-ray procedures, events which had all occurred before the end of

1990, are barred. The only remaining nuisance claims are those attributable to the flare and the

steam valve, the two new dimensions to the pre-existing Phillips complex by the ethylene unit.

When considering the effects of the sporadic "assaults" of the flare and the valve on the ordinary

sensibilities of a reasonable person living in the vicinity of the entire Phillips Plant complex, the

damages become minimal. The Court, therefore, **FINDS** that Franky Joe LeMaster and Billie

Wayne LeMaster should each be awarded **$2,500.000** for these claims.

　　　　Unlike Damon, the LeMasters have introduced into the record some direct evidence of the

nature, duration and severity of their mental anguish and the disruption it has had on their daily

routines. Any damages award for mental anguish must, however, be for mental anguish

attributable to the independent tort claim upon which the Plaintiff's prevail, damages cannot be

awarded if they are attributable to unsuccessful claims. <u>Parkway Co. v. Woodruff</u>, 901 S.W.2d

at 442-43  Consequently, the LeMaster's entitlement to damages for mental anguish is limited to

the degree to which the flare and valve aggravated any prior mental anguish the LeMasters had

historically endured as a result of the construction and operations at the entire Phillips complex.

Under this test, the amount of the LeMaster's damages for mental anguish is also minimal.  For the foregoing reasons, the Court **FINDS** that Franky Joe LeMaster and Billy Wayne LeMaster should each be awarded **$1,000.00** for mental anguish attributable to the operation of the flare and steam valve at the Phillips Ethylene Plant.

Finally, the LeMasters seek damages to compensate them for their fear that they may develop some Phillips-related diseases in the future.  As stated above, Texas law does not recognize such a cause of action.  Temple-Inland Forest Products, 993 S.W.2d at 94  The Court does not doubt their concern and it sincerely hopes neither of the LeMasters will ever develop any diseases.  But, if they do, they may file suit at that time.  Pustejovsky, 35 S.W.3d at 653

### REMAINDER OF NON-SETTLING PLAINTIFFS

The following non-settling Plaintiffs could not be located, or failed and/or refused to respond to the Court's Notices:

VANESSA TOLBERT

JOICE LANCE TOLBERT

WANDA LYNN ARNOLD

TONY WEEKS

CYNTHIA K. PARRISH

LESLIE HERBERT PARISH, JR.

DAVID E. WIGGINS

ANDRA WOODARD TAYLOR

FREDDIE LOUIS BONNER

DELORES HELMS

ELIJAH W. JAMES

MATILDA ANN JAMES

LUDWELL Z. TAYLOR

J. CHANCE

The Court, therefore, **FINDS** that all claims of these non-settling Plaintiffs should be **DISMISSED with prejudice**.

## NOTICE

The Parties **SHALL** have until **April 8, 2005**, to file any objections to this Report. The Clerk **SHALL** send copies of this Report to the Parties by the means in place for transmission of same. The Objections **SHALL** be mailed to the United States Clerk's Office, P.O. Drawer 2300, Galveston, Texas 7553. **Any Objections filed SHALL be contained in a written document specifically entitled "Objections to the Report and Findings of the Special Master"**, which will then be forwarded to the District Judge for consideration.

**DONE** at Galveston, Texas, this _____ 17th _____ day of March, 2005.

_____

JOHN R. FROESCHNER
UNITED STATES MAGISTRATE JUDGE

24